IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| ALLEN BABER, | ) | |
| | ) | |
| Plaintiff, | ) | CV-04-1208-ST |
| | ) | |
| v. | ) | OPINION AND ORDER |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

STEWART, Magistrate Judge:

## INTRODUCTION

Pursuant to 42 USC §§ 405(g) and 1383(c)(3) (incorporating § 405(g)), plaintiff, Allen Baber ("Baber"), seeks judicial review of a final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") under Titles II and XVI of the Social Security Act.

///

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). For the reasons discussed below, the Commissioner's decision is affirmed.

## PROCEDURAL BACKGROUND

On May 10, 2000, Baber protectively filed applications for DIB and SSI. Those applications alleged disability since February 14, 1998, and were initially denied on November 28, 2000, and also denied on reconsideration on May 3, 2001. Tr. 15, 76.[1] Baber did not request a hearing before an ALJ to consider those denials. *Id.*

Baber earned sufficient quarters of coverage to remain insured through September 30, 2001. Tr. 16, 64. Just over three months after he was no longer insured, on January 10, 2002, Baber again protectively applied for DIB and SSI, alleging disability from heart failure, arthritis, diabetes, and a bad back and knees as of February 14, 1998. Tr. 53-55, 67, 252-55. After those subsequent applications were denied initially and upon reconsideration, he requested a hearing before an ALJ. Tr. 26-30, 33-35, 257-60, 263-65.

A hearing was held concerning Baber's January 10, 2002 applications before an Administrative Law Judge ("ALJ") on January 15, 2004. Tr. 267-89. The ALJ denied Baber's claim for benefits on June 7, 2004. Tr. 15-23. Baber requested review of the ALJ's decision, which the Appeals Council denied on August 9, 2004. Tr. 4-7. Accordingly, the ALJ's decision became the final decision of the Commissioner.

///

---

[1] Citations are to the page number of the transcript of the record filed with the Commissioner's Answer.

# DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A).

The Commissioner has established a five-step sequential process for determining whether a person is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 US 137, 140 (1987); 20 CFR §§ 404.1520, 416.920.

At step one, the ALJ found that Baber had not engaged in substantial gainful activity since February 14, 1998. Tr. 22 (Finding #2); 20 CFR §§ 404.1520(b), 416.920(b).

At step two, the ALJ found that Baber had a severe impairment of degenerative joint disease of the right knee. Tr. 17; 20 CFR §§ 404.1520(c), 416.920(c). The ALJ also found that Baber had several non-severe impairments, including angina pectoris, coronary artery disease, hypertension, type 2 diabetes mellitus, and sleep apnea. Tr. 17 (noting that those impairments "result in only minimal work-related limitations").

If the adjudication proceeds to step three, the Commissioner must assess the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 CFR §§ 404.1520(e), 404.1545; 20 CFR §§ 416.920(a)(4)(iii), 416.920(d); Social Security Ruling ("SSR") 96-8p. Here the ALJ found that Baber's impairments did not meet or equal the requirements of a listed impairment. Tr. 17,

3 - OPINION AND ORDER

23 (Finding #4). The ALJ determined that Baber retained an RFC which limited him to lift or carry up to 25 pounds frequently and up to 50 pounds occasionally and also requires the ability to sit or stand at will. Tr. 21, 23 (Finding #7).

At step four the Commissioner will find the claimant not disabled if he or she retains the RFC to perform work he or she has done in the past. 20 CFR §§ 404.1520(e), 416.920(a)(4)(iv) & (f). Here the ALJ found that Baber was no longer able to perform any of his past work. Tr. 22-23 (Finding #8).

If the adjudication reaches step five, the Commissioner must determine whether the claimant can perform other work that exists in the national economy. *Yuckert*, 482 US at 141-42; 20 CFR §§ 404.1520(f), 416.920(f). The burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can perform. *Yuckert*, 482 US at 141-42; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999). If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR §§ 404.1566, 416.966. Relying upon testimony from a vocational expert, the ALJ found that Baber could perform a significant number of jobs existing in the national economy, specifically production assembly jobs. Tr. 22-23 (Finding #12).

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986). The Commissioner's decision must be upheld, even if the evidence is susceptible to more than one rational interpretation. *Andrews*, 53 F3d at 1039-40. If substantial evidence supports the Commissioner's conclusion, the Commissioner must be affirmed; "the court may not substitute its judgment for that of the Commissioner." *Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).

## STATEMENT OF THE FACTS

### I. Baber's History

Baber was born on January 24, 1950. Tr. 53. He completed the tenth grade and received training as a carpenter. Tr. 73. His past relevant work includes jobs as a mechanic and truck driver/loader. Tr. 68, 106, 108, 135, 274.

### II. Medical Evidence

The court has carefully reviewed the medical records submitted with the administrative transcript. Neither party challenges the summary of this evidence recited in the ALJ's written decision. Accordingly, it is not necessary to recount it here.

### III. VE Testimony

Jenipher Gaffney testified at the hearing as a Vocational Expert ("VE"). Tr. 282. The ALJ posed two hypothetical questions to the VE. In the first hypothetical, the VE was asked to assume the claimant was a 53 year old male with a 10th grade education and Baber's past relevant work who is capable of lifting 50 pounds occasionally, 25 pounds frequently, but who needs to sit or stand at will. The VE testified that such a person would be unable to perform

Baber's past relevant work, but would be able to perform production assembly jobs, which are light, unskilled occupations. Tr. 284. Of the 14,000 production assembly jobs in Oregon and 5,000 such jobs in the metro area, up to 20% could involve assembling items that would be familiar to a person with a background as a mechanic. Tr. 284-85. When asked by Baber's attorney what effect would be caused by adding a restriction of not keeping the head still in a fixed position for more than a half an hour, the VE testified that production assembly jobs require frequent or constant forward flexion. Tr. 286-87. When asked how the answer to this hypothetical would change if the individual was unable to handle items two-thirds of the work day, the VE testified that if the individual were limited to occasional handling, the production assembly jobs would be precluded, but if the individual could frequently or constantly handle items, the jobs would not be precluded. Tr. 287-88.

In the second hypothetical, the ALJ asked the VE to assume the same facts as the first hypothetical, but also include lapses in attention and concentration to the task due to angina attacks. Tr. 285. Such attacks would occur three to five times per day for a period of 10 minutes each, during which time the employee would be unable to work. The VE testified that this restriction would preclude the individual from performing production assembly jobs. *Id*.

## DISCUSSION

### I. Effect of Prior Determination and Claimant's Claims of Error

The Commissioner argues that Baber has failed to overcome the presumption of continuing nondisability that arises from the Commissioner's prior determination that Baber was not disabled. Assuming that hurdle can be overcome, Baber contends that the ALJ erred by: (1) finding several of his impairments non-severe; (2) failing to include limitations imposed by

the non-severe impairments, as found by non-examining doctors, thereby miscalculating his RFC and failing to give complete hypothetical questions to the VE; and (3) failing to prove that he retains the ability to perform other work in the national economy.

## II. Failure to Rebut Presumption of Non-Disability

Baber first filed applications for DIB and SSI on May 10, 2000, and alleged disability since February 14, 1998. Tr. 15.[2] Those claims were denied in initial determinations on November 28, 2000, and on reconsideration determinations on May 3, 2001. Baber did not request a hearing before an ALJ concerning those applications. *Id*.

When the Commissioner denies an earlier application for benefits by a claimant, a presumption of nondisability generally arises. *Schneider v. Comm'r*, 223 F3d 968, 973 (9th Cir 2000). However, the presumption may be overcome if the claimant presents evidence of "'changed circumstances.'" *Id*, quoting *Hammock v. Bowen*, 879 F2d 498, 501 (9th Cir 1989). A claimant may show changed circumstances by demonstrating: (1) a change his or her age category; (2) an increase in the severity of the claimant's impairment(s); (3) the existence of an impairment not previously considered; or (4) a change in the criteria for determining disability. Social Security Acquiescence Ruling ("AR") 97-4(9), 1997 WL 742758 *3 (December 3, 1997). These rules apply in cases brought under both Title II (DIB) and Title XVI (SSI). *Id* at *3 n2.

Baber has demonstrated no change in circumstances sufficient to overcome the presumption of continuing nondisability since the adjudication of his prior claims for DIB and SSI. He did not change age categories during the time between his initial applications or the

---

[2] The only reference to the prior application and its contents presently in the record is in the ALJ's opinion. However, Baber has not disputed the Commissioner's recitation of the facts concerning the previous applications or their contents.

7 - OPINION AND ORDER

denial of the present application. Instead, at all times between the date Baber filed his first set of DIB and SSI applications (May 10, 2000), and the date the Appeals Council denied his request for review of the ALJ's June 7, 2004 decision (August 9, 2004), Baber (born on January 24, 1950) remained between the ages of 50 and 54, or "closely approaching advanced age." 20 CFR § 404.1563(d) (defining "closely approaching advanced age" as chronological age between 50-54).

Nor does the record contain evidence of any other change in circumstances sufficient to overcome the presumption of continuing nondisability. Baber has not identified, nor is this court aware of, any material change in the criteria to establish disability. Moreover, Baber's most recent applications list the same alleged onset date as his earlier applications, suggesting that he relies on the same impairments to support his claims. This leaves the possibility of an increase in the severity of his impairments or additional impairments not previously considered. However, the record reveals no significant vocationally-relevant medical or mental developments since the May 3, 2001 denial of Baber's first set of DIB and SSI applications.

By the time of that denial, Baber was already treating: (1) intermittent chest pains with nitroglycerine; (2) chronic knee pain with aspirin, exercise, and the use of a neoprene sleeve; (3) sleep apnea with the use of a CPAP (Continuous Positive Airway Pressure) device; (4) hypertension with medications (Verapamil and Maxzide); and (5) hyperlipidemia with medications (Gemfibrozil, and later with Sinvastatin). Tr. 191-92, 194, 209, 238. He had also already experienced several syncopal episodes shortly before he first applied for benefits, and over a year before those applications were denied on reconsideration. Tr. 236-37 (chart notes

from May 1, 2000 syncopal episode describing "several syncopal episodes with no seizure-like activity" with the last such episode "several months ago").

The record reveals that, between the denials of Baber's initial and the subsequent applications for benefits, (on January 24, 2002), he was diagnosed with diabetes. However, he apparently is not on medications and controls his blood sugar level by controlling his diet. Tr. 158, 167-68. Baber also experienced another syncopal episode on January 5, 2002. Tr. 140. He was apparently working on his shop at home when he became hot and flushed, and passed out. *Id*. He was transported to the Salem Hospital where Dr. Timothy S. Edelblute opined that possible considerations included a vasovagal type episode, new onset of seizure disorder, cardiac dysrhythmia, hypoglycemia, or electrolyte disorder, but noted that he doubted hypoglycemia due to a blood sugar reading of 115 taken by the medics. Tr. 142-44. Dr. Chuong H. Nguyen admitted him to the PCU for further observation. Tr. 144. However, blood and urine tests, an EEG, a chest X-ray, and comprehensive chemistry profile all were within normal limits, other than a slightly elevated blood sugar level. Tr. 143, 146-48. Baber was discharged the same day with a diagnosis of synocope and collapse, hypopotassemia, and old myocardial infarction. Tr. 139-41, 171-72. He also advised no further driving until a further follow-up. Tr. 172.

On January 14, 2002, Baber was seen for a follow-up appointment regarding the syncopal episode. Tr. 165. At that time he reported having similar episodes in March 2001 and early 2000, and indicated that the episodes may occur a few times per year. Tr. 165, 167. Baber also reported having a "longstanding history of intolerance to heat" and admitted to rarely paying much attention to his hydration status. Tr. 167.

On February 6, 2002, Baber underwent an outpatient neurology consultation regarding his synocopal episode. Tr. 166-69. The consulting neurologist found that no specific therapy was needed at that time, but recommended that various measures be taken if Baber continued to exhibit heat intolerance. Tr. 168-69. Baber was released to drive and returned to his primary care practitioner. Tr. 169.

In sum, the record reveals that Baber was being treated for most of the impairments on which he bases his applications for benefits prior to the time of the adjudication of his first set of DIB and SSI applications. The one additional diagnosis made thereafter – diabetes – is being successfully controlled by modifications to Baber's diet. As a result, Baber has failed to offer any change of circumstances sufficient to rebut the presumption of nondisability that arose with the denial of his first claims for benefits. His appeal of the denial of the second set of DIB and SSI applications may be affirmed on that basis alone.

### III. <u>Finding of Non-Severity of Several Impairments</u>

The ALJ found that Baber suffers from the severe impairment of degenerative joint disease, and several non-severe impairments, including angina pectoris, coronary artery disease, hypertension, type II diabetes mellitus, and sleep apnea. Baber contends that the ALJ erred by failing to find each of these impairments, as well as his cholesterolemia, severe and by failing to include a variety of environmental limitations identified by two nonexamining doctors premised upon this series of impairments. Because the ALJ did not expressly include each of the limitations identified by the nonexamining doctors in the hypothetical questions posed to the VE, Baber contends that the ALJ failed to meet his burden at step five of identifying other work Baber could perform. This court disagrees.

The ALJ's review of the record and medical evidence is thorough and accurate. Although the ALJ does not expressly acknowledge the environmental limitations identified by the non-examining doctors (Tr. 250), he carefully reviewed the medical evidence, Baber's activities of daily living, the history of Baber's impairments, and the effectiveness of the treatment, including medication, for Baber's impairments. The record supports the conclusion that the impairments identified by the ALJ as non-severe are ones which Baber has successfully treated with diet or minimal medication and are impairments which impose very few, if any, functional limitations.

The only impairment not specifically listed by the ALJ in his analysis is that of cholesterolemia. On April 1, 2000, Dr. Kendall R. Michels of the Portland Veterans' Administration Hospital examined Baber and noted "likely hyperlipidemia" based on the observation that Baber was taking Genfibrozil. Tr. 209. Dr. Michels ordered liver function tests with a view toward switching him to a statin. *Id.* A month later, the Genfibrozil was discontinued and Sinvastatin was prescribed. Tr. 238. Nothing in the record suggests that Baber's cholesterolemia has not been controlled by medication, or that it imposes any significant functional limitations on him. Thus, Baber's argument that the ALJ erred by failing to include impairments other than his degenerative joint disease in those considered as "severe" is rejected.

**IV. Failure to Include Limitations; Ability to Perform Other Work in the Economy**

Because the ALJ found that Baber could no longer perform his past work, the burden shifted to the Commissioner to prove that Baber could perform other jobs existing in significant numbers in the national economy. Based on his evaluation of Baber's RFC and the testimony of the VE, the ALJ concluded that Baber could perform light, unskilled assembly jobs. Baber

11 - OPINION AND ORDER

contends that had the ALJ should have included other restrictions in his RFC, and if the ALJ had done so, he would meet the criteria for disability.

Baber's primary contention is that the ALJ erred by rejecting limitations suggested by a doctor hired by the Commissioner to perform a records review. On July 26, 2002, Dr. Robert McDonald, acting as a medical consultant for the Commissioner, reviewed Baber's medical records. Tr. 157. Dr. McDonald found a history of angina pectoris and right knee pain, sleep apnea, hypertension, and well-controlled diabetes. *Id.* Dr. McDonald recommended a "light" RFC, found that Baber would not be able to return to his past relevant work, and based on Vocational Rule 202.11, concluded that Baber was not disabled as of his date last insured (September 30, 2001) and was not then (July 26, 2002) disabled. *Id.*

Nine months later, on March 26, 2003, after reviewing Baber's records and Dr. McDonald's report,[3] Dr. Martin Kehrli completed a form identifying various limitations. He concluded that Baber could occasionally lift 20 pounds and frequently lift 10 pounds, sit or stand about six hours out of an eight hour workday, could occasionally climb, balance, stoop, kneel, crouch, and crawl, and had no visual or manipulative limitations. Tr. 247-50. Dr. Kehrli indicated that Baber should avoid concentrated exposure to extreme cold and heat, vibration, fumes, odors, dusts, gases, and work hazards such as machinery and heights. Tr. 250. He also affirmed Dr. McDonald's July 26, 2002 assessment. Tr. 124, 156. Baber argues that the ALJ erred in rejecting the environmental limitations suggested by Dr. Kehrli.

---

[3] Baber suggests that Dr. McDonald affirmed the conclusions of Dr. Kehrli, rather than the other way around. However, the page containing Dr. Kehrli's signature states that he was reviewing the evidence in the file as well as the "assessment of 7-26-02," which he "affirmed as written." Tr. 156. Dr. McDonald's report is dated July 26, 2002. Tr. 157. Thus, it appears that Dr. Kehrli filled out the form and included the environmental limitations cited by Baber.

The vast majority of social security appeals where a doctor's opinion is at issue involve a claimant's argument that the ALJ erred by rejecting the opinion of a treating doctor in favor of the opinion of an examining or a nonexamining doctor. Unlike those cases, this case involves Baber's argument that the ALJ erred by failing to include limitations suggested by Dr. Kehrli, a nonexamining doctor hired by the Commissioner. The opinions of Social Security program physicians and psychologists "are to be considered and addressed [by the ALJ] as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s)." Social Security Ruling ("SSR") 96-6p. As opinions by nonexamining sources, the opinions of Social Security program physicians are to be accorded less weight than the opinions of treating or examining doctors, and do not – in and of themselves – constitute evidence substantial enough to reject the opinions of treating or examining doctors. *Lester v. Chater*, 81 F3d 821, 831 (9th Cir 1995).

The ALJ rejected the opinions of Drs. McDonald and Kehrli on two points. First, the ALJ rejected the conclusion that Baber was limited to "light" work. Dr. McDonald found that Baber should have a "light" RFC, apparently based on Baber's statement that he could "lift up to 40-50 [pounds occasionally] 2-3 times, but not for 1/3 of the time." Tr. 157. Dr. Kehrli confirmed Dr. McDonald's conclusion of a "light" RFC, but noted that Baber stated that he can "lift 40-50 [pounds occasionally]." Tr. 251. The ALJ carefully reviewed the evidence in the record concerning Baber's activities of daily living, as well as Baber's own testimony about his lifting ability. Based on that evidence, it was not error to find that Baber was capable of "medium" rather than "light" work. Thus, to the degree the ALJ rejected this portion of the opinions of Drs. McDonald and Kehrli, it was not error.

Dr. Kehrli also indicated that Baber has several environmental limitations, specifically that he should avoid concentrated exposure to extreme cold and heat, vibration, fumes, odors, dusts, gases, and work hazards such as machinery and heights. Tr. 250. Baber contends that these limitations should be credited. Since these limitations are inconsistent with the only work identified as work he could perform (assembly work), Baber concludes that the ALJ failed to meet his burden at step five, thus mandating a finding of disabled.

Baber's argument is not persuasive for several reasons. First, the limitations suggested by Dr. Kehrli consist of nothing more than check marks on a form which are not accompanied by any explanation, despite the fact that the form asks the preparer to give an explanation of "how these environmental factors impair activities and identify hazards to be avoided." Tr. 250. Second, neither Baber's treating doctors nor Dr. McDonald identified these same environmental limitations. Third, these limitations appear to be related to the syncope incidents Baber periodically experiences. The available evidence suggests that these incidents may be caused by dehydration, lack of food, and hypotension. Tr. 167-68. As such, these limitations would be inappropriate to include in an RFC analysis. *See* SSR 96-8p at *2 n5 (noting that the assessment of RFC must be "concerned with the impact of a disease process or injury").

Finally, even assuming these environmental limitations were recognized, Baber fails to identify how most of these limitations would preclude the jobs identified by the VE and the ALJ. Baber cites two categories of assembly jobs, namely Small Products Assembler (DOT 706.684-022), and Production Assembler (DOT 706.687-010). In both jobs, the worker "[p]laces parts in specified relationship to each other" and "[b]olts, clips, screws, cements, or otherwise fastens parts together by hand or using handtools or portable powered tools." The Small Products

Assemblers also "[l]oads and unloads previously setup machines, such as arbor presses, drill presses, taps, spot-welding machines, riveting machines, milling machines, or broaches, to perform fastening, force fitting, or light metal-cutting operation on assembly line." Similarly, the Production Assembler "[m]ay tend machines, such as arbor presses or riveting machine, to perform force fitting or fastening operations on assembly line." Nothing in the job descriptions of these positions indicates that they would be precluded by a need to avoid exposure to extreme cold and heat, fumes, odors, dusts, gases, and work hazards such as heights.

Nevertheless, Baber contends that they are inconsistent with the limitation that he avoid concentrated exposure to vibration and work hazards such as machinery. However, nothing in these job descriptions mandates "concentrated exposure" to vibration and machinery. To the contrary, the descriptions suggest that these jobs involve manually fastening parts together by mechanical means, sometimes with the assistance of small hand tools. The assembly-line nature of the work also suggests that, while some of the positions "may" involve tending machines, other positions do not. In short, the record reveals no substantial evidence to support the imposition of the limitations suggested by Baber, and even if such limitations were included, those limitations do not preclude the jobs identified by the ALJ.

Baber also argues that the ALJ improperly failed to make a finding of transferrable work skills and only identified jobs that a person with transferrable work skills as a mechanic could perform. However, that argument misconstrues the exchange between the ALJ and the VE at the hearing. In response to the ALJ's first hypothetical, the VE testified that the hypothetical claimant could perform light, unskilled, general production assembly jobs, and testified that over a million such jobs existed nationally and 14,000 such jobs existed statewide. Tr. 284. In

response to a further inquiry by the ALJ, the VE testified that "probably not more than 20 percent" of the assembly jobs she had identified would involve assembling items that would be familiar to a person with past relevant work as a mechanic. Contrary to Baber's argument that the ALJ only identified jobs that would require a finding of transferrable work skills from mechanic positions, the ALJ merely attempted to determine what percentage of the production assembly jobs might involve items that were familiar to a person with such a background. This does not change the fact that the production assembly jobs identified by the VE were *light, unskilled* occupations, which do not require a finding of transferrable work skills.

In sum, the Commissioner met the burden imposed at step five and Baber's arguments to the contrary are without merit.

## **ORDER**

For the reasons stated above, the Commissioner's decision is affirmed.

DATED this 8th day of July, 2005.

/s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge